```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9-11-2018
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
Twanya McKinley,

                                                  Plaintiff,

                  -against-

Commissioner, Social Security Administration,

                                                  Defendant.
-----------------------------------------------------------------------X

**OPINION AND ORDER**

**17-CV-6439 (KHP)**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Twanya McKinley ("Plaintiff"), who is represented by pro bono counsel, commenced this action against Defendant Commissioner of the Social Security Administration (the "Commissioner"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Plaintiff was not disabled under sections 216(i) and 1614(a)(3)(A) of the Act from June 21, 2014[1] through the date of the decision.

      The parties have submitted cross-motions for judgment on the pleadings (Doc. Nos. 18, 24.) For the reasons set forth below, the Commissioner's motion is DENIED and Plaintiff's motion is GRANTED for further proceedings consistent with this Opinion and Order.

## BACKGROUND

### I. Summary Of Claim And Procedural History

      Plaintiff is 46 years of age. (R. 57.) She has five children, and is the sole care-taker of her son, Prince, who is eight years of age and autistic. (R. 10.) According to her son's doctor,

---

[1] Plaintiff does not dispute that the applicable onset date is June 21, 2014, even though her application for benefits alleges disability beginning February 3, 2014. Plaintiff previously filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging an onset date of October 10, 2011. Those applications were denied on June 20, 2014 in a written decision by Administrative Law Judge ("ALJ") Seth I. Grossman. (Administrative Record ("R.") 98-108.) Plaintiff failed to appeal that decision and concedes in her cross-motion for judgment on the pleadings that res judicata bars her application for benefits for the period prior to June 20, 2014.

1

Plaintiff's son requires continuous supervision and care by his mother.  (*Id.*)  Plaintiff testified at her hearing that she has no one else to help watch her son.[2]  (R. 59.)  Plaintiff was in an abusive relationship for 13 years with the father of her two youngest children.  (R. 583.)  She used crack/cocaine for 10 years but stopped in April 2013 after attending various substance abuse treatment programs.  (*Id.*)  She previously served a three and a half-year prison sentence for selling drugs.  (*Id.*)  While in prison, Plaintiff was hospitalized after overdosing on over-the-counter medications in a suicide attempt.  (R. 584.)  She has received psychiatric treatment regularly since 2005 and has a history of auditory and visual hallucinations, paranoia and dual personalities.  (R. 334-35, 413, 506-07 (Plaintiff reporting in August 2014 and March 2015 that her auditory hallucinations were worsening).)  From July 2014 through June 2015, her psychiatrists sometimes assigned her a GAF score of 45, indicating "serious" symptoms such as suicidal ideation.  (R. 321, 497, 505, 525, 536.)  She has severe pain in her ankle from a gunshot wound in 1995.  Doctors were unable to remove bullet shrapnel and, as a result, Plaintiff uses a leg brace, cane and walker.  (*See, e.g.*, R. 76-77, 281, 403, 431.)  In addition, Plaintiff has short-term memory deficit, impaired concentration and attention, and difficulty learning new material.  (*See, e.g.*, R. 118, 133, 431-32, 458.)

Plaintiff and her son have lived in various shelters in New York.  (*Id.*)  She did not graduate from high school.[3]  (R. 57, 230.)  Plaintiff previously worked as an in-home hair braider from 2012 through 2013, until her son was diagnosed with autism, which limited her ability to

---

[2] In her request for review of the ALJ's decision, Plaintiff wrote that she requests that the Appeals Counsel review the decision because her son has a disability and she is unable to work because of that, and because she has "sick mental health."  (R. 182.)

[3] The record is inconsistent regarding Plaintiff's education.  Some records indicate Plaintiff completed school through the sixth or seventh grade, while others note she completed school through the eighth or ninth grade.  (*See, e.g.*, R. 116, 431, 468.)

travel to her clients' homes. (R. 60-61.) In 2000, Plaintiff worked in retail for one month but left when she could not complete her job duties because she was physically unable to remain standing and place items on the shelves, and in 2002 she worked at White Castle for two months but was laid off because she could not stand for the duration of her shift due to severe pain in her ankle. (R. 65, 230, 469.) In total, over the past eighteen years, Plaintiff has had less than two years of total experience in the work force. (R. 257.)

On August 20, 2014, Plaintiff filed applications for DIB and SSI, alleging disability beginning on February 3, 2014. (R. 183, 190.) In her applications, she alleged disability due to chronic ankle pain, traumatic arthritis, depression, mental illness, bipolar disorder, and sleep apnea. (R. 112, 229.) On October 29, 2014, the Social Security Administration (the "Administration") denied her claim. (R. 140.) Plaintiff subsequently requested a hearing by an ALJ.[4] (R. 146.) A hearing took place on June 14, 2016 before ALJ Elias Feuer. (R. 54.) Plaintiff was not represented by counsel at the hearing, and the ALJ gave Plaintiff the opportunity to obtain representation and reschedule the hearing, which Plaintiff declined. Joe Atkinson, a vocational expert, testified telephonically at the hearing. On January 17, 2017, ALJ Feuer issued a decision finding Plaintiff not disabled. (R. 14-28.) On August 10, 2017, the Appeals Council denied Plaintiff's request for review of ALJ Feuer's decision. (R. 1.)

Plaintiff filled out a function report in connection with her application for benefits in August 2014. (R. 214.) Plaintiff wrote in the report that from the time she wakes up until she goes to bed she does "nothing" but take her medicine and stay home. (*Id.*) She indicated that

---

[4] In her request for a hearing, Plaintiff wrote that she disagrees with the Administration's determination because she was diagnosed with schizophrenia and bipolar disorders, she cannot work around people, and she has to be home for her son's services. (*Id.*)

3

she goes outside very rarely because she cannot be around a lot of people.  (*Id.*)  She also wrote that she does not shop, socialize with other people, or pay bills, and that she has no hobbies or interests.  (R. 219.)

## II.   The Administrative Record

The Court conducted a plenary review of the entire administrative record.  Plaintiff saw the following medical providers after June 21, 2014: Dr. Tummala P. Naidu (treating psychiatrist), Dr. Syed Bukhari (non-treating psychiatrist), Dr. Deepika Singh (treating psychiatrist), Dr. Raul Calicdan (treating psychiatrist), Dr. David Mahony (consultative psychiatrist), Dr. Sharon Revan (consultative internist), Dr. David Guttman (Fedcap intake doctor), and Dr. S. Juriga (State agency psychologist).  (*See, e.g.*, R. 117-18, 120-22, 130-31, 133-35, 261, 431, 435, 436-439, 474-87, 490, 494, 495-533, 587-619.)  The majority of the medical records during the relevant time period concern Plaintiff's mental impairments (including bipolar disorder and schizoaffective disorder).  Plaintiff takes Depakote, Abilify, and Remeron for her mental impairments, as well as Omeprazole, Valproic Acid and Ambien.  (R. 435, 436.)

## III.  Plaintiff's Hearing

At the June 2016 hearing before the ALJ, Plaintiff described her symptoms and physical limitations.  She testified that she has had mental health issues for many years and that she receives mental health treatment at Harlem Hospital.  (R. 70, 82.)  Though Plaintiff initially indicated she does not hear voices when she takes her medication (R. 72-73), she later testified that she does hear voices even when taking her medication.  (R. 82.)

With respect to her daily living, Plaintiff testified that she lives in a shelter with her son. (R. 57.)  She testified that she cleans and does the shopping for her and her son (though

sometimes her sister helps her). She sometimes attends church on Sundays. (R. 74.) Later in the hearing, Plaintiff testified that she does not go out, except to go to one store to get everything that she needs because she cannot be around people. (R. 82.) Plaintiff reported that she chooses to keep to herself rather than interact with others and that sometimes she has problems with other people when she is out in public. (R. 77-78.) She also repeatedly stated that she cannot work around people because they "look like they got bugs on them" and because she is "scared to work with them." (R. 81-82.) She indicated that she stopped working as a hair braider after her son was diagnosed with autism. (R. 61.) She testified that if her son had not been diagnosed with autism, she would still be working as a hair braider and could braid hair while sitting down. (R. 61-63.)

Dr. Atkinson, a vocational expert also testified at the hearing. Dr. Atkinson testified that an individual with the same age, education, and past work experience as Plaintiff could perform other jobs in the national economy, including jobs as a document preparer, addresser, and stem mounter. (R. 78-80.)

## IV.     *The Commissioner's Decision*

As a threshold matter, the ALJ determined that res judicata requires denial of Plaintiff's disability claim for the period prior to June 20, 2014, the date of the earlier decision denying Plaintiff's application for benefits. (R. 14.) The ALJ then set forth the rationale for his decision denying benefits according to the five-step sequential process contemplated in the applicable regulations. 20 C.F.R. § 404.1520(c)(a)(4)(i-v). First, he determined that Plaintiff met the insured status requirements of the Act through December 31, 2018 and that Plaintiff had not engaged in substantial gainful activity since June 21, 2014. (R. 17.) At the second step of the

analysis, the ALJ determined that Plaintiff had one severe impairment: left knee and ankle disorder. (*Id.*) The ALJ also reviewed the Plaintiff's other impairments, including back pain, schizoaffective disorder, and bipolar disorder. (*Id.*) Regarding Plaintiff's mental impairments, the ALJ considered the four functional areas set out in 20 C.F.R., Part 404, Subpart P, Appendix 1 (the "Listings"), for evaluating mental disorders: activities of daily living, social functioning, maintaining concentration, persistence or pace, and episodes of decompensation. (R. 17-18.) Upon review of these four broad functional areas, the ALJ determined that Plaintiff had either no limitation or only mild limitation. (*Id.*) The ALJ therefore concluded that Plaintiff's mental impairments were non-severe. (R. 17.) At step three of the analysis, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Listings. (R. 22.) The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, limited to work "which does not require more than occasional ramp/stair climbing, kneeling, crawling and balancing and which (to minimize stress) does not entail assembly line work." (*Id.*) Based on this RFC, at step four of the sequential analysis, the ALJ concluded that Plaintiff is capable of performing her past relevant work as a hair stylist, as actually performed. (R. 26.) The ALJ determined that this work does not require the performance of work-related activities precluded by Plaintiff's RFC. (*Id.*) Alternatively, the ALJ found at step five of the sequential analysis that there are other jobs in the national economy that Plaintiff is able to perform. (R. 27.) In making his determination at step five, the ALJ relied on the testimony of the vocational expert and the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the

"Guidelines"). (*Id.*) Accordingly, the ALJ found that Plaintiff has not been disabled from June 21 2014 through the date of the decision.

## DISCUSSION

### I.     The Applicable Law

#### A.     *Judicial Standard Of Review Of Commissioner's Determination*

The court's review of an appeal of a denial of disability benefits is limited to two inquiries. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. *Id*. So long as they are supported by substantial evidence in the administrative record, the findings of the ALJ after a hearing as to any facts are conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3).

An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *id.*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his or her reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 429 (N.D.N.Y 2008).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is

substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Thus, the court does not determine *de novo* whether a claimant is disabled.  *Id.* (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise."  *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."  42 U.S.C. §§ 423(d)(5)(B), 1382(a)(3)(H)(i).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."  42 U.S.C. § 405(b)(1).  While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (*per curiam*), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (internal quotation marks omitted), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability.  *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-cv-1120 (DC), 2002 WL 826812, at *6

(S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded treating physician evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)). If the decision denying benefits applied the correct legal standards and is based on substantial evidence, the reviewing court must affirm; if not, the court may modify or reverse the decision, with or without remand. 42 U.S.C. § 405(g).

### B.  *Legal Principles Applicable To The Commissioner's Disability Determination*

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:

(1) First, determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).

(2) Second, if not gainfully engaged in any activity, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities. Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe." 20 C.F.R. § 404.1520(c)(a)(4)(ii).

(3) Third, if the claimant has a "severe impairment," determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled and the claimant will be eligible for benefits. 20 C.F.R. § 404.1520(c)(a)(4)(iii). At this stage, the Commissioner also must determine the claimant's residual functional capacity ("RFC"); that is, her ability to perform physical and mental work activities on a sustained basis despite her impairments.[5] 20 C.F.R. § 404.1520(e).

(4) Fourth, if the claimant does not meet the criteria for being presumed disabled, the Commissioner next must determine whether the claimant possesses the RFC to perform her past work. 20 C.F.R. § 404.1520(a)(4)(iv).

(5) Fifth, if the claimant is not capable of performing work she performed in the past, the Commissioner must determine whether the claimant is capable of performing other work.

---

[5] A claimant's residual functional capacity is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's residual functional capacity is his maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's residual functional capacity must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs, the opinions of treating and consultative physicians, and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)).

20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  The claimant bears the burden at the first four steps.  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  However at the last step, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform."  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

## II.     *Application Of The Legal Standards To Plaintiff's Claims*

Before addressing whether the ALJ's decision is supported by substantial evidence, the Court must first address whether the ALJ made any legal errors.

Plaintiff makes four arguments concerning the ALJ's analysis of Plaintiff's mental impairments.  First, Plaintiff argues that the ALJ improperly applied the treating physician rule when analyzing the opinions of Plaintiff's treating psychiatrist Dr. Naidu, consultative psychiatrist Dr. Mahony, and FedCap psychiatrist Dr. Guttman.  Second, Plaintiff argues that the ALJ committed legal error by failing to consider Plaintiff's testimony regarding her hallucinations and mental competency.  Third, Plaintiff argues that the ALJ erred in concluding that Plaintiff's schizoaffective disorder was non-severe and did not meet or medically equal the severity of Listing 12.03.  Fourth, Plaintiff argues that the ALJ lacked substantial evidence when determining Plaintiff's RFC because the ALJ made almost no mention of Plaintiff's mental limitations when analyzing Plaintiff's capabilities.

The Court is unable to evaluate Plaintiff's arguments because there are gaps in the record concerning Plaintiff's mental impairments.  Specifically, the record does not contain a medical source statement from Plaintiff's treating psychiatrists after the alleged onset date.  A medical source statement is an evaluation of "what an individual can still do despite a severe

11

impairment, in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996)).  The Second Circuit has held that an ALJ's failure to obtain a medical source statement from a treating physician before making a disability determination is not necessarily an error requiring remand.  *See Tankisi v. Comm'r of Social Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).  The inquiry into the need for a medical source statement from a treating physician hinges on the "circumstances of the particular case, the comprehensiveness of the administrative record and whether [the record] although lacking the opinion of [the] treating physician, was sufficiently comprehensive to permit an informed finding by the ALJ." *Hooper*, 199 F. Supp. 3d at 814 (quoting *Sanchez v. Colvin*, No. 13-cv-6303, 2014 WL 736102, at *5-6 (S.D.N.Y. Feb. 20, 2015)) (citing *Tankisi*, 521 F. App'x at 33-34).  For the ALJ to make a disability determination without seeking a medical source statement concerning Plaintiff's functional limitations, there must be "no obvious gaps in the administrative record," and the ALJ must "[possess] a complete medical history." *Rosa*, 168 F.3d at 83 n. 5 (internal citations omitted).

In Social Security proceedings, the ALJ must affirmatively develop the record on behalf of all claimants.  *See Moran,* 569 F.3d at 112.  As part of this duty, the ALJ must investigate the facts and develop the arguments both for and against granting benefits.  *Id.*  Whether the ALJ has met her duty to develop the record is a threshold question.  Thus, before reviewing whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative

record." *Scott v. Astrue,* No. 09-cv-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (internal quotations and citations omitted).

There are obvious gaps in the present administrative record.  Plaintiff has been treated at Harlem Hospital Center since 2013 through at least June 2016, where she consistently saw Dr. Naidu, Dr. Calicdan, and Dr. Singh.  (R. 34.)  Yet, the medical evidence from Plaintiff's treating psychiatrists at Harlem Hospital regarding Plaintiff's mental impairments consists solely of treatment notes taken during follow-up and medication management appointments.  The record contains only two medical source statements concerning Plaintiff's mental impairments: one from Dr. Mahony, Plaintiff's consultative psychiatrist, and one from Dr. Guttman, a FedCap psychiatrist.  In his medical source statement, Dr. Mahony opined that Plaintiff has mild difficulty with maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, making appropriate decisions, relating to others and dealing with stress.  (R. 433.)  Dr. Mahony concluded that these difficulties are due to Plaintiff's psychiatric problems and that these psychiatric problems "will interfere with [Plaintiff's] ability to function on a daily basis."  (*Id.*)  The ALJ afforded "little weight" to Dr. Mahony's conclusion that Plaintiff's psychiatric problems will interfere with her ability to function on a daily basis because the conclusion is "inconsistent" with treatment notes from Plaintiff's treating psychiatrists.  (R. 21.)  In his medical source statement, Dr. Guttman concluded that, due to Plaintiff's chronic schizoaffective disorder, Plaintiff requires a work accommodation for a low stress environment.  He also opined that Plaintiff's restrictions of activities of daily living prevent her adherence to a regular work routine, "which prevents employment."  (R. 484-85.)  The ALJ similarly afforded "little weight" to Dr. Guttman's

conclusion because treatment notes from Plaintiff's treating psychiatrists "do not establish the existence of an impairment that would prevent employment." (R. 21.) In other words, ALJ Feuer relied extensively on treatment notes from Plaintiff's treating psychiatrists to discount Dr. Mahony's and Dr. Guttman's conclusions that Plaintiff could not work, (*id.* at 17-21) even though these treatment notes do not describe Plaintiff's functional limitations. The ALJ therefore determined that Plaintiff did not suffer from a severe mental impairment and that Plaintiff could perform all sedentary work (besides for assembly line work) despite her mental impairments without an actual assessment of the functional limitations caused by Plaintiff's mental impairments from any of Plaintiff's treating psychiatrists.

Furthermore, the ALJ also incorrectly concluded that Dr. Mahony's and Dr. Guttman's medical source statements were inconsistent with the treatment notes from Dr. Naidu and Dr. Bukhari. Dr. Naidu and Dr. Bukhari both reported that Plaintiff's auditory hallucinations were worsening. (R. 413, 506-07.) These observations, based on Plaintiff's statements to the psychiatrists, corroborate Dr. Mahony's and Dr. Guttman's conclusions regarding Plaintiff's abilities to work and/or function on a daily basis.

This Court finds that the ALJ committed legal error by failing to obtain a medical source statement from at least one of Plaintiff's treating psychiatrists. Another court in this district arrived at the same conclusion with a similar set of facts. In *Sanchez v. Colvin*, the plaintiff filed an application for disability benefits claiming bipolar disorder and schizophrenia. No. 13-cv-6303 (PAE), 2015 WL 736102, at *1 (S.D.N.Y. Feb. 20, 2015). The record contained no medical source statement from the plaintiff's treating psychologist regarding the plaintiff's limitations and/or ability to work, but rather, only contained treatment notes from the treating

14

psychologist and medical source statements from consulting physicians. *Id.* at *2. Nevertheless, the ALJ concluded that the plaintiff was not disabled based on one-time examinations of consulting physicians and the plaintiff's description of her symptoms and activities of daily living. *Id.* The court remanded, finding that the ALJ committed legal error by failing to obtain opinions from the plaintiff's treating psychologist regarding her specific limitations because bipolar disorder and schizophrenia "are long-term disorders whose gravity and impact vary by individual," and thus, a "treating psychiatrist's insights, which may capture what a one-time visit to a consulting psychologist cannot, would be obviously valuable." *Id.* at *7. The court held that the underlying treatment notes from the treating psychologist, even when augmented by the opinion of a consultative examiner, did not "come close to compensating for the lack of a treating psychiatrist's opinion." *Id.* at *9. The court explained that the treatment notes are "cursory" and "do not meaningfully convey *how* the condition in question affects the particular patient . . . [a]nd under the [Administration's] regulations, such an assessment is the crucial issue for determining a disability claimant's RFC, and is [the] central reason for the general preference given to treating physicians' opinions." *Id.* (emphasis in original).

Similarly, here, ALJ Feuer assessed Plaintiff's RFC based solely on vague treatment notes from Plaintiff's treating psychiatrists, two medical source statements from consultative psychiatrists, and Plaintiff's own testimony. Dr. Mahony's and Dr. Guttman's medical source statements do not sufficiently or clearly describe Plaintiff's functional limitations and are based only on a single visit with the Plaintiff. *See id.* at *7. For example, Dr. Mahony opined that Plaintiff's limitations will interfere with her ability to function on a daily basis, (R. 433), but he

did not elaborate on this point. He did not describe the severity of the interference or how the interference with Plaintiff's ability to function will impact her ability to work. Similarly, Dr. Guttman opined that Plaintiff's chronic schizoaffective disorder, unspecified bipolar disorder, schizophrenic disorder, antisocial personality disorder, and unspecified personality disorder resulted in restrictions of daily living that prevent Plaintiff's adherence to a regular work routine. (R. 486-88.) Dr. Guttman failed to explain the specific restrictions of daily living caused by Plaintiff's impairments or how those restrictions prevent adherence to a regular work routine (including, for example, how often Plaintiff may need to miss work). *See Sanchez*, 2015 WL 736102, at *6 (noting that similar opinions from consultative psychologist are vague and "far from conclusive.").

The treatment notes from Dr. Naidu, Dr. Singh and Dr. Calicdu are almost identical to those of the treating psychologist in *Sanchez*. *See id.* at *8. The notes are from sessions lasting approximately 20 minutes or less. They repeatedly (1) list "schizoaffective disorder, chronic with acute exacerbation" or "schizoaffective disorder, unspecified" and/or "bipolar I disorder, most recent episode (or current) depressed, moderate" under the "problem list," (2) indicate that Plaintiff is being treated for schizoaffective disorder, (3) note there are no changes in Plaintiff's medication, (4) direct Plaintiff to return for a follow-up appointment, and (5) briefly list some of Plaintiff's symptoms (*i.e.*, "She hears voices, has 2 personalities. She has paranoia," "She hears voices on and off," "Alert and oriented to all spheres. Cognition is fair. Insight and judgment is partial," "Thought process: logical and goal directed," and "Continue medication to keep her stable"). (*See, e.g.*, R. 320-21, 334-35, 495-97, 498-501, 502-05, 506-08, 510-513, 514-16, 518-21, 522-25, 526-29, 530-33, 534-36, 537-39, 587-89, 590-93, 594-96, 597-99, 600-03,

604-07, 608-10, 611-13, 614-16, 617-19.) Only a few of the treatment notes briefly reference Plaintiff's functioning: Dr. Naidu's treatment note in June 2015 states that Plaintiff's "functional status" is "complete independence in all [activities of daily living], self care and instrumental," (R. 496), Dr. Naidu's treatment note in March 2016 states that Plaintiff is "stable" with "no deterioration" (R. 602), and Dr. Calicdan's treatment note in August 2016 states that Plaintiff is "functioning fairl[ly] in the community" with "no overt decompensation." (R. 591.) However, these small portions of the treatment notes do not constitute a medical source statement describing Plaintiff's capabilities to perform work as required by the Administration and courts in this district. Moreover, most of the treatment notes do not contain even brief phrases characterizing Plaintiff's state or functionality. *See Sanchez*, 2015 WL 736102, at *8 (similar treatment notes "lack the sorts of nuanced descriptions and assessments that would permit an outside reviewer to thoughtfully consider the extent and nature of [Plaintiff's] mental health conditions and their impact on her RFC. The ALJ and reviewing courts should not have to be in the position of attempting to decode vague notations.").

The treatment notes are not only cursory and lack detail, they are also inconsistent. Plaintiff's treating psychiatrists assigned Plaintiff different GAF scores in her monthly visits. (*Compare* R. 335, 501, 508, 513, 516, 521, 529, 533, 539, 610, 619 (assigning Plaintiff a GAF score of 55 in June, August, September, November, and December 2014, as well as February, March, May, July and October 2015) *with* R. 321, 497, 505, 525, 536 (assigning Plaintiff a GAF score of 45 in July and October 2014 and April and June of 2015) *with* R. 616 (assigning Plaintiff a GAF score of 60 in August 2015).) A GAF score of 55 indicates "moderate" symptoms or moderate difficulty in social occupational, or school functioning; while a GAF score of 45

indicates "serious" symptoms (such as suicidal ideation) or serious impairments in social, occupational, or school functioning.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 33-34 (American Psychiatric Association, 4th ed. text rev. 2000).  ALJ Feuer mentioned these differing GAF scores in his decision, but nevertheless concluded that from September 2013 through June 2016 it was "repeatedly determined" that Plaintiff's GAF score was 55 (despite the records to the contrary in July and October 2014 and April and June 2015) and that Plaintiff was only mildly impacted by her psychiatric conditions even though the GAF scores in totality indicate that Plaintiff's psychiatric conditions had a moderate-to-serious impact on Plaintiff's functioning.  (R. 20.)

Additionally, although the ALJ referred extensively to Plaintiff's treatment notes in explaining his RFC determination (R. 17-21), "the ALJ's own interpretation of the treatment notes does not supersede the need for a medical source to weigh in on [Plaintiff's] functional limitations."  *Hooper*, 199 F. Supp. 3d at 816.

Put simply, ALJ Feuer failed to obtain a comprehensive assessment of the functional limitations caused by Plaintiff's schizoaffective disorder from any treating psychiatrist.  As in *Sanchez,* "the failure to obtain [a] treating psychiatrist's opinion was a gaping hole in the record" and the Court therefore cannot conclude that the ALJ adequately discharged his duty to develop the record.  *Sanchez*, 2015 WL 736102, at *7; *see also Veley v. Colvin*, No. 1:13-cv-01204 (MAT), 2016 WL 8671963, at *7 (W.D.N.Y. Jan. 29, 2016) (where treating physician's notes showed that "plaintiff had a serious mental health impairment requiring multiple medications for treatment of bipolar disorder and schizophrenia," the ALJ's failure to obtain a medical source statement "as to plaintiff's actual mental limitations in a work setting" was error

18

requiring remand); *Downes v. Colvin*, No. 14-cv-7147 (JLC), 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (finding that although the evidentiary record contained treatment notes, test results, and "direct assessments of [the plaintiff's] functional capacities" from consultative physicians, the ALJ could not have made an informed determination without the treating physician's medical opinion and therefore remand was appropriate to fill the gaps in the record regarding the plaintiff's functional limitations); *Moreira v. Colvin*, No. 13-cv-4850 (JGK), 2014 WL 4634296, at *7 (S.D.N.Y. Sept. 15, 2014) (remanding where the ALJ failed to resolve "gaps and inconsistencies" in the medical record and heavily relied on a consultative examiner's report rather than seeking a treating physician's opinion); *Aceto v. Comm'r of Soc. Sec.*, No. 6:08-cv-169 (FJS), 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) ("Since the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC."). "When a disability claim is based on a psychiatric illness, the ALJ's duty to develop the record is 'enhanced.'" *Burton-Mann v. Colvin*, No. 15-cv-7392 (JGK), 2016 WL 4367973, at *4 (S.D.N.Y. Aug. 13, 2016) (quoting *Camilo v. Comm'r of Soc. Sec.*, No. 11-cv-1345 (DAB), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013); *see also Rizzo v. Berryhill*, No. 16-cv-4898 (CS) (PED), 2017 WL 3578701 at *16 ("[T]he duty to develop the record is particularly important where an applicant alleges he is suffering from mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or stress of the workplace.") (internal citation and quotation marks omitted); *Martinez v. Comm'r of Soc. Sec.*, No. 16-cv-2298 (PGG) (BCM), 2017 WL 9802837 at *14 (S.D.N.Y. Sept. 19, 2017) ("The obligation to obtain [a medical source statement] from the claimant's treating physicians is particularly salient where mental

impairments are at issue, because a mental health patient may have good days and bad days; she may respond to different stressors that are not always active.") (internal citation and quotation marks omitted), *adopted* 2018 WL 1474405 (S.D.N.Y. Mar. 26, 2018).

As this Court concludes that remand is warranted for further development of the record regarding Plaintiff's mental impairments, there is no need to address the ALJ's analysis of Plaintiff's physical impairments or whether the ALJ's opinion is supported by substantial evidence in the record. However, the Court does note that the ALJ did not adequately assess Plaintiff's credibility, especially in light of Plaintiff's testimony at the hearing about her hallucinations and mental competency. In addition, the ALJ's hypotheticals to the vocational expert at the hearing did not sufficiently address all of Plaintiff's mental limitations, including her deficiencies in memory and concentration. Thus, the vocational expert may not have considered all of Plaintiff's limitations when concluding that other jobs existed in the national economy that Plaintiff could perform.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED, Defendant's cross-motion for judgment on the pleadings is DENIED, and the case is REMANDED for further proceedings as stated above pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should obtain an opinion from Plaintiff's treating psychiatrist as to Plaintiff's non-exertional limitation(s) resulting from Plaintiff's mental impairments.

**SO ORDERED.**

Dated: September 11, 2018
New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge